In re KORS, INC., Debtor.

David D. ROBINSON, Trustee,

v.

The HOWARD BANK, Rutland Industrial
Development Corporation, and Small
Business Investment Corporation of
Vermont, Inc.

Civ. A. No. 85–262.

United States District Court,
D. Vermont.

July 18, 1986.

See also, Bkrtcy., 13 B.R. 676, 13 B.R.
683, 11 B.R. 324, 15 B.R. 444, and 22 B.R.
19.

Jerome I. Meyers, White River Junction,
Vt., for trustee Robinson.

Richard A. Hull, William C. Dagger,
Dick, Hackel & Hull, Rutland, Vt., for
Howard Bank.

James S. Abatiell, Abatiell & Abatiell, Rutland, Vt., for Rutland Industrial Development Corp.

Andrew R. Field, Montpelier, Vt., for Small Business Inv. Corp. of Vt.

### OPINION

HOLDEN, Senior District Judge.

The Howard Bank (the "Bank"), by this appeal challenges the order and underlying rulings of the bankruptcy court concerning the disposition of the proceeds from the sale of certain machinery and equipment of the bankrupt debtor Kors, Inc. The bankruptcy court, acting on the amended complaint of the trustee, avoided the unperfected security interest of the Bank in the collateral. The court's order not only preserved for the bankrupt estate the unperfected lien, but also afforded the trustee the Bank's rights in a subordination agreement between the Bank and the Small Business Investment Corporation of Vermont ("SBIC").

The controlling facts are not in serious dispute. The financial transactions which led to the bankruptcy court's judgment cover a relatively brief time period that began on June 19, 1978.

*The Lease Agreement*

By a lease agreement bearing the date of June 19, 1978, the Rutland Industrial Development Corporation ("RIDC")[1] leased to Kors the machinery that is the subject of the present controversy. The lease was for a term of ten years and granted Kors the option to purchase the leased equipment at the end of the term for the nominal consideration of one dollar. The lease also provided that the leased property was subject and subordinate to the terms and provisions of a security agreement given by RIDC to the Bank dated July 12, 1978, in the total principal amount of $1,510,000. (Lease Agreement RIDC to Kors, Inc., Exhibit A).

*Security Agreement of SBIC with Kors and RIDC*

On the lease date, June 19, 1978, SBIC and Kors entered into a Loan and Security Agreement by which SBIC loaned working capital to Kors in the amount of $400,000. The indebtedness was secured by accounts receivable, inventory and all of Kors "machinery, equipment and tangible property of every kind and nature now and hereafter acquired, including all such property as may be leased to Company (Kors) by Rutland Industrial Development Corporation...." The agreement further provided that RIDC joined in the execution of the agreement

for the sole purpose of granting to Lender [SBIC] a security interest in and to the [leased] property, with respect to said corporation's right title and interests herein above granted to Lender [SBIC] by Company [Kors] and/or Rutland Industrial Development Corporation, [which security interest] shall be subject and subordinate to the effect to be given to any prior security interests therein required to be given to the Howard

---

1. RIDC is not a commercial enterprise in the traditional sense. As its name implies and the security agreement attests, RIDC is a development credit corporation organized and sponsored by the law of Vermont (8 V.S.A. §§ 1801–1804) to provide financial assistance to certain business enterprises "potentially valuable to the state or its citizens." 8 V.S.A. § 1801 provides:

    The expression "development credit corporation" hereinafter called the corporation, as used in this chapter and section 1153 of this title, shall mean a corporation, incorporated under the general laws of the state, the purposes of which shall be:
    (1) To provide financial assistance to industrial agricultural, recreational or other enterprises potentially valuable to the state or its

citizens, when and to the extent which, such financing shall lie beyond the prescribed limits of laws governing banks of deposit;
    (2) To assist by research and counsel such enterprises;
    (3) To conduct ex parte inquiries into ways and means of improving, promoting or increasing the general welfare of the state, its political subdivisions and its citizens by financial aid, counsel or otherwise; and
    (4) To dedicate its energies to the discovery of ways and means of returning to maximum productivity any and all presently non-producing assets in the state, for the dual purpose of increasing the welfare of the owner and of augmenting the taxable potential of the state.

Bank. Further, Lender agrees to subordinate its security interests to any other Lender as may hereinafter finance the purchase by Company [Kors] of additional machinery and equipment.

Loan and Security Agreement SBIC, Kors, Inc., Exhibit C.

*Security Agreement of Bank with Kors and RIDC*

On July 12, 1978, RIDC, Kors and the Bank entered into a security agreement before SBIC filed a financing statement to cover its $400,000 loan to Kors. The preamble to the agreement identified RIDC as a local development corporation organized and existing under the provisions of Chapter 65, Title 8 of the Vermont Statutes Annotated. The Howard Bank was described as the lead bank participating with other banking institutions in the loan to Kors.

The security agreement set forth a plan to equip Kors to manufacture various plastic products. More specifically, RIDC proposed to purchase, for the benefit of Kors, new equipment and machinery from Riefenhauser U.S.A. Sales Corp. ("Rextrusion") and to lease the manufacturing equipment directly to Kors. The Howard Bank made a commitment to loan $1,510,000 to Kors and RIDC collectively for this purpose by way of Note #1 for $1,359,000 and Note #2 for $151,000.[2]

The security agreement described the collateral as the equipment and machinery to be purchased by RIDC from Riefenhauser, and leased to Kors, including "all additions, accessories and substitutions thereto, and all proceeds of their disposition...." Kors and RIDC agreed not to permit any other security interest in the collateral.[3] The agreement also provided, however,

> that a security interest in the Collateral subordinate to the security granted hereby may be given to American Research Development Division of Textron, Inc. ... or SBIC of Vermont as additional

security for a loan to Kors, Inc. of $400,000.

Security Agreement of July 12, 1978, Exhibit B.

*Record of Financing Statements*

On July 13, 1978, the Bank filed financing statements with the city clerk and the secretary of state. They were signed only by RIDC as the debtor. Although Kors is referred to as a party to the security agreement dated July 12, 1978, the financing statements were not signed by Kors, Inc.

SBIC also filed financing statements in connection with its security agreement with the Vermont secretary of State and the Rutland City Clerk's Office. The filings were made on July 19, 1978. One financing statement was signed by SBIC, as the secured party, and Kors as the Debtor. The second statement was similarly signed by SBIC as the secured party, and by RIDC as the Debtor. Both financing statements covered machinery and equipment of all kinds acquired and leased to Kors in its manufacturing plant located in the Rutland Industrial Center in Rutland "subject however to the effect to be given a previous security interest granted to the Howard Bank." (Exhibits S–4 and S–5).

On October 30, 1979, and again on December 20, 1979, the Bank advanced additional loans of $176,000 and $750,000. The Bank again filed financing statements signed by RIDC, as debtor, which described the encumbered property as "certain equipment and machinery owned by the Debtor ... as described in part in a Security Agreement by and between the Debtor, Kors, Inc., and the Secured Party [the Bank]." A list of the machinery purchased by the proceeds of the first Bank loan was attached. No list was attached to the third loan of $750,000.

A statement of subordination was filed and signed by SBIC on December 20, 1979, which provided:

---

2. Security Agreement, 12 July, 1978, Kors, Inc., RIDC and Howard Bank (Exhibit B) par. 1, Obligation to Pay.

3. Exhibit B, par. 2, Collateral.

The undersigned hereby subordinates its security interest in and to certain machinery and equipment to a security interest therein given of even date herewith by Debtor to The Howard Bank to secure a debt in the amount of $750,000.

Again, RIDC was listed as the debtor; it was not indexed under Kors.

The security agreements between RIDC and the Bank, referred to in the financing statements, were also filed. However, financing statements listing Kors as the debtor were not indexed at the recording offices to serve notice of the Bank's interests.

### Later Amendments

After the June 19, 1978 loan of $400,000, Kors borrowed additional sums from SBIC. $100,000 was secured by an amended security agreement between SBIC and Kors dated November 26, 1979; a second amended security agreement dated March 10, 1980, between the same parties, secured two additional notes of $75,000 and $225,000.

The first amended security agreement between Kors and SBIC of November 26, 1979 extends the SBIC security to additional machinery and equipment " ... all subject, however, to the effect to be given to a purchase money security interest in said machinery and equipment to be given by Rutland Industrial Development Corporation and/or the Company [Kors] to the Howard Bank of Burlington, Vermont to secure a loan of $750,000." The second amended security agreement dated March 10, 1980, does not include a subordination provision; indeed, the Bank is not mentioned. The bankruptcy court, however, found that every financing statement filed by SBIC or the Bank with the Secretary of State was stamped by that office with the word SUBORDINATION.

The day of reckoning came on November 24, 1980, when Kors filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The case was converted to Chapter 7 liquidation proceedings on August 14, 1981.

On April 22, 1982, the bankruptcy trustee sold all the Kors equipment by consent of the parties. The sale was confirmed by the court on July 14, 1982. The proceeds of the sale totaled $1,100,000.

The bankruptcy judge, 50 B.R. 874 (Bankr.D.Vt.1985), concluded his findings of fact by determining the unpaid balances due the Bank and SBIC as of the date of the filing of the Petition for Relief on November 28, 1980[sic]:

| | |
|---|---|
| The Howard Bank | $2,591,841.15 |
| SBIC | 804,943.95 |

Interest accrues on The Howard Bank loans at the rate of $778.62 per diem and the interest on the SBIC loans up to May 1, 1984 amounts to $413,810.50 so that the total indebtedness to SBIC as of May 1, 1984 was $1,218,754.45.

### DISCUSSION

Judge Marro defined the issues before the bankruptcy court:

(1) Whether the RIDC–Kors lease was a true lease or, alternatively, a financial lease intended to have effect as security;

(2) Whether on bankruptcy day the Bank as secured party was perfected as against Kors;

(3) The extent of collateral in which SBIC has a perfected security interest.

The court resolved these issued by deciding:

1. The RIDC–Kors lease created a security interest, rather than a leasehold. (Bankruptcy Op. 11).

2. The Bank did not hold a perfected security interest in any collateral. (Bankruptcy Ct. Op. 16).

3. SBIC had a perfected security interest in all Kors personal property, "subject however to the effect to be given to security interest[s] granted to the Howard Bank." (Bankruptcy Op. 22).

By the application of the provisions of the Uniform Commercial Code, 9A V.S.A. § 9–301(3), the bankruptcy court held that since the Bank did not file any financing

statement signed by Kors, the Bank's security interest was preserved by the bankruptcy trustee under Section 544 of the Bankruptcy Code.

Beyond ruling that the trustee preserved the Bank's unperfected security interest for the benefit of the estate, the bankruptcy judge further held that the estate acceded to the Bank's rights under its subordination agreement with SBIC for the benefit of all creditors of the estate.

To review the result reached in the bankruptcy court according to the errors assigned by the Bank, we start with the principles stated in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979):

> The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as inproper preferences over general creditors. Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.
>
> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609 [81 S.Ct. 347, 350, 5 L.Ed.2d 323]. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

*Id.* at 54–55, 99 S.Ct. at 917–18. (footnotes omitted).

The state law applied by the bankruptcy judge was the Uniform Commercial Code (U.C.C.) as adopted and codified in Title 9A of Vermont Statutes Annotated.

The Bank's security interest in the Kors inventory, machinery and equipment had its beginnings in the Lease Agreement of Kors, Inc. and RIDC of June 19, 1978. According to the general definitions of a security interest under 9A V.S.A. § 1–201(37), the lease arrangement between the parties, which included the option to purchase for the consideration of one dollar, created a security interest, rather than a leasehold. However, the security interest expressed in the lease was not perfected since no financing statement was recorded as required by Part 3 of the Code, 9A V.S.A. §§ 9–301 *et seq.* Apparently relying on the illusion that RIDC was the true owner of the collateral, the Bank, Kors and RIDC executed a security agreement on July 12, 1978. Although the actual debtor was Kors, the financing statement recorded by the Bank the following day was signed only by RIDC. Since the Bank's security interest was unperfected for want of the debtor Kors' signature on the financing statement on the day of bankruptcy, it remained unperfected as to the proceeds under §§ 9–306 and 9–402(2).

Kors' voluntary petition under Chapter 11 invoked the provisions of 11 U.S.C. § 544(a). This provision is referred to in legislative history as the "strong-arm clause." Senate Report No. 95–598. The pertinent provisions of the Act place the trustees in the hypothetical posture of ideal creditors and bona fide purchasers at the time of the commencement of the case:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract

could have obtained a judicial lien, whether or not such a credit exists;

. . . .

11 U.S.C. § 544(a).

The bankruptcy judge applied this aspect of the Bankruptcy Code to avoid the Bank's unperfected security interest in the collateral. The application of 11 U.S.C. § 551, the court held, transferred the Bank's lien to the trustee. The bankruptcy court explained that, by way of § 551, the trustee "step[ped] in the shoes" of the Bank to enforce the Bank's subordination agreement with RIDC and SBIC and to preserve the priority it conferred for the benefit of the general creditors.

The court recognized that SBIC had a perfected security interest in all of Kors' personal property, "subject, however, to the effect to be given to security interest[s] granted to the Howard Bank." The opinion reasoned, however, that since the trustee inherited the Bank's security interest, he also acquired, by subrogation from the Bank, all the benefits and priorities derived from the subordination agreement intended by the Bank and SBIC as lenders and Kors-RIDC, the borrowers.

The bankruptcy court rejected the Bank's effort to enforce its subordination agreement with SBIC, Kors and RIDC. The bankruptcy judge reached the result on the premise that the trustee who has successfully avoided the Bank's unperfected interest in property, preserves the lien and steps into the Bank's shoes, not only in the avoided security interest, but appropriates the Bank's rights under the subordination agreement for the benefit of general creditors, pursuant to 11 U.S.C. §§ 544 and 551. In operation and effect, trustee's avoidance of the Bank's unperfected security in the Kors equipment preserved the subordination agreement for the trustee, thereby releasing SBIC from its obligation to subordinate, for the common benefit of

all the creditors of Kors at the time of its voluntary petition.

The Bankruptcy Act of 1978 provides:
A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law.

11 U.S.C. § 510(a).

The parallel enactment in the Uniform Commercial Code provides:
Nothing in this Article (9) prevents subordination by agreement by any person entitled to priority.

9A V.S.A. § 9–316.[4]

■ In the blend of the Bankruptcy Act and the Uniform Commercial Code, this court has found no provision, and the parties have not referred to any rule, that constitutes a subordination agreement to be a security interest. The broad definition given to "a security interest" in 9A V.S.A. § 1–201(37) does not include subordination agreement. *See* White and Summers, Law of the Commercial Code, § 22–2; Am. Jur.2d Commercial Code § 36.

■ Although a subordination contract is not considered to be a security interest, the undertaking is recognized in the U.C.C. And the bankruptcy law regards such an agreement that is free from fraud or preference to be "enforceable under applicable non-bankruptcy law." It is so written in 11 U.S.C. § 501. Generally, subordination agreements are enforced by the bankruptcy courts. Such enforcement is not contrary to the policy of equal distribution of the bankrupt's estate. *In re Credit Industrial Corporation*, 366 F.2d 402, 408 (2d Cir.1966). To give the trustee priority for the benefit of unsecured general creditors in contravention of a subordination contract, confers benefits which were not bargained for. "Equality among creditors who have lawfully bargained for different treatment is not equity but its oppo-

---

**4.** The purpose of this section is "to make it entirely clear that a person entitled to priority may effectively agree to subordinate his claim. Only the person entitled to priority may make such an agreement; his rights cannot be adversely affected by an agreement to which he is not a party." U.C.C. § 9–316, Uniform Laws Comment.

site...." *Chemical Bank New York Trust Company v. Kheel,* 369 F.2d 845, 848 (2d Cir.1966) (Friendly, J., concurring opinion).

The bankruptcy court recognized the subordination agreement given by SBIC when the Bank loaned the funds to Kors to purchase the Rextrusion machinery. It further observed that the perfected security interest of SBIC and the unperfected security interest of the Bank included mutually exclusive pieces of equipment. It appears that the court then went on to separate the Rextrusion machinery from SBIC's security interest. By virtue of the subordination agreement, the Bank's interest in the Rextrusion machinery was eliminated from SBIC's collateral. However, the court preserved that interest for the benefit of the estate, free and clear of any obligation to subordinate.

■ This result was reached by the court's application of the preservation provisions of 11 U.S.C. § 551. The trustee's rights preserved by this section are effected by means of subrogation. The rights have certain limitation. *E.g. Taubel-Scot-Kitzmiller Co. v. Fox,* 264 U.S. 426, 435, 44 S.Ct. 396, 399–400, 68 L.Ed. 770 (1924) (Brandeis, J.) (the predecessor of this section granted substantive rights by subrogation which were subordinate to rights of sheriff in possession at time of bankruptcy.)

*Taubel* refers in the margin to an earlier appeal on *certiorari* to the supreme court of Vermont. In affirming, the Supreme Court held:

> Under the present bankruptcy act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or encumbrance of the property which is void as against the trustee by some positive provision of the act. *In re Garcewich,* 115 Fed.Rep. 87, 89 [2nd Cir.1902] and cases cited.

■ To be sure, the trustee, by way of the strong-arm application of Section 544, may avoid the Bank's lien on the Rextrusion machinery. However, the provisions of Section 551 do not preserve the Bank's subordination rights for the benefit of interest of general creditors, including SBIC's excluded security interest in the proceeds derived from the trustee's sale of the Rextrusion machinery.

Since the trustee has preserved the Bank's lien on the Rextrusion machinery, the proceeds from its sale should be distributed in accordance with the subordination agreement which Kors, RIDC and SBIC promised, to protect the Bank on the loan made to purchase the machinery. It matters not whether the subordination arrangement with the Bank is considered an agreement or an assignment, it is subject to the equitable considerations appropriate to the transaction. *Citibank v. Tele/Resources, Inc.,* 724 F.2d 266, 269 (2nd Cir. 1983). This consequence is much in keeping with the reasoning and result reached by Judge Weinstein in *In the Matter of Fried Furniture Corp.,* 293 F.Supp. 92 (E.D.N.Y.1968), *affirmed* 407 F.2d 360 (2d Cir.1969). *See also In the Matter of Excel Stores, Inc.,* 341 F.2d 961 (2d Cir.1965). (Any creditor of the debtor, or other interested person searching the record, would discover the prior, but incorrect, financing statement.)

> A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have "explicitly agreed not to accept them."

*In re Credit Industrial Corporation, supra,* 366 F.2d at 410.

On review of the result reached in the bankruptcy court on Point 3, the court is persuaded that the trustee, although advantaged by Section 544, and standing in the shoes of the Bank, by way of subrogation under Section 551, is not empowered to preserve the Bank's lien in the proceeds of

the sale of the machinery acquired by the bankrupt by loans from the Bank, and at the same time overpower the subordination contract which the parties agreed to, in order to finance the loans required to launch the Kors enterprise.

The construction which the trustee and SBIC join in urging

> would give the trustee power to set aside transactions which no creditor could void and which injured no creditor. That construction would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy.

*Lewis v. Manufacturers National Bank, supra,* 364 U.S. at 608 and 609, 81 S.Ct. at 350.[5]

In this case, had any prepetition creditor consulted the official U.C.C. place of records to determine the financial condition of Kors, he would have found SBIC's properly recorded financing statement showing its perfected security interest "subject to a previous security interest granted to The Howard Bank."

The court holds the subordination agreement, which provided underpinning for the Bank's loan, should be enforced in the distribution of the proceeds of the trustee's sale according to the terms of the parties who made the agreement.

For the reasons stated, the judgment order of the bankruptcy court, which nullifies the Bank's subordination agreement for the benefit of the bankruptcy estate, is reversed. In all other respects the amended judgment order of the court is affirmed and the cause remanded for further proceedings consistent with this opinion and as the present circumstances of the case require.

It is SO ORDERED.

---

5. The concise concurring opinion is enlightening.

> MR. JUSTICE HARLAN: As the judge who wrote for the Court of Appeals in *Constance v. Harvey,* 215 F.2d 571 [ (2nd Cir.1954) ], I think it appropriate to say that I have long since come to the view that the second opinion in *Constance,* 215 F.2d 575, was ill-considered. ı welcome this opportunity to join in setting the matter right.